IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

Criminal No. 21-476

RODERICK FEURTADO
TAREK BOUANANE
ROBERTO GUTIERREZ

SENTENCING MEMORANDUM

AND NOW comes the United States of America by its attorneys, Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, and Jeffrey R. Bengel, Assistant United States Attorney for said district, and respectfully files this sentencing memorandum.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves a scheme to defraud that specifically targeted elderly victims in Western Pennsylvania and other states across the country. For the victims, the scheme began when they received a phone call from a member of the conspiracy, impersonating one of their grandchildren. The "grandchild" told the victim that they had been detained as a result of a reckless driving accident, in which they had collided with a car driven by someone else—in many cases, a pregnant woman.

Fortunately, the "grandchild" continued, an attorney had agreed to represent them. Another conspirator, now impersonating the attorney, spoke with the victim, informing them that their grandchild needed money—usually thousands of dollars—in order to be released from jail. Cash was preferable, the attorney continued, and for the victim's convenience, the "attorney" could send a bail-bondsman directly to the victim's home to retrieve it. But it was important, explained the "attorney," that the victim abide by the "gag order" on the case. The victim should not tell anyone—their spouse, their children, or any inquisitive bank tellers—about their grandchild's detention and the thousands of dollars that they were about to pay toward their bond. When another

1

member of the conspiracy, now impersonating a bail-bondsman, arrived at the door, most victims simply handed over the money.

This scheme was designed to intentionally prey upon the love and concern that grandparents feel for their grandchildren. The emotional distress caused to the victim was not an unintentional by-product of the fraud; it was an essential piece. By causing the victim to worry about the safety of their grandchild, placing pressure on them, and isolating them through the "gag order," the members of the scheme could induce them to part with thousands, and sometimes tens-of-thousands, of dollars. The more distressed the victim, the more likely they were to pay. Victims interviewed as part of this investigation described feeling embarrassed, taken advantage of, less trusting, and less safe.

In September 2021, the defendants Roderick Feurtado, Tarek Bouanane, and Roberto Gutierrez arrived in Pittsburgh to carry out the scheme. Bouanane and Gutierrez were the "bondsmen," who picked up thousands or tens of thousands of dollars in cash directly from the elderly victims at their homes. Pittsburgh was the first stop for Gutierrez as a member of the conspiracy. Bouanane, on the other hand, had already picked up money from victims in New Hampshire and dropped a share of the stolen cash in New York City. Feurtado was the "safehouse." In that role, he helped direct the activities of the "bondsmen," collected the cash that they had stolen from the elderly victims, and arranged to transfer it to other members of the conspiracy. Feurtado had recruited both Bouanane and Gutierrez as members of the conspiracy and had direct ties to its managers in Panama, including Stefano Zanetti and Samuel Ferrer Avila.

While the conspirators were carrying out the fraud in Pittsburgh, Zanetti sent them instructions over Signal, an encrypted messaging application, using the alias "Loyalty." In some of the instructions, Zanetti provided the name of a victim, their home address, and the amount of money that the "bondsman" was supposed to collect. Other instructions were more focused on *how* the defendants were supposed to collect the money. These included directions to drive past

the victims' homes before approaching, park cars blocks away where they could not be seen, use aliases when going to the victims' doors, look for cameras, and avoid gated communities. Zanetti described these instructions as techniques to ensure the "safety" of his crews. But they were quite obviously designed to do something else: avoid detection by police.

In that respect, the conspirators were unsuccessful. On September 29, 2021, Bethel Park and Upper St. Clair Police learned that an elderly man who had been targeted by the fraud was at a local bank, trying to withdraw $30,000 in cash. When the "bondsman" arrived at the victim's home to collect the money, they took him into custody and identified him as Roberto Gutierrez. Following Gutierrez's arrest, he went silent on Signal—and Zanetti became concerned. In a burst of voice messages to Feurtado, Zanetti sought to confirm that Feurtado had told Gutierrez to "erase everything," instructed Feurtado to switch hotels, and worried aloud that Gutierrez had been "caught." Early on the morning of September 30, 2021, the Pennsylvania State Police found Feurtado—who had indeed switched hotel rooms hours earlier—at the airport Marriott. Inside his room, they recovered a shoebox containing more than $220,000 in cash and a handwritten ledger, in which Feurtado had been tracking the money picked up by Gutierrez and Bouanane. Later that morning, Pennsylvania State Police found Bouanane at a hotel on the Northshore—also in possession of thousands of dollars in cash. Records obtained from the peer-to-peer rental car application Turo revealed that Bouanane had urgently tried to return his rental car the previous evening, after Gutierrez had been arrested.

Feurtado, Bouanane, and Gutierrez were each charged by a grand jury in the Western District of Pennsylvania with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. While their cases were pending, in February 2022, another group arrived in Pittsburgh to carry out the same fraud against elderly victims. This group, also alleged to have been directed from Panama by Zanetti and Ferrer, included Hector Enrique Escorihuela Gil as the safehouse and Yhonlester Wuiler Manuel Da Silva Quintero and Adrian Paul Orozco Perez as "bondsmen." All three of

3

those individuals were also charged by the grand jury and have now pled guilty. *See* Criminal Case Nos. 22-132 & 22-235 (W.D. Pa.). Orozco Perez has previously been sentenced by the Court to 36 months of imprisonment.

Finally, on December 6, 2022, the grand jury charged Stefano Zanetti, *see* Criminal Case No. 22-306, Samuel David Ferrer Avila, *see* Criminal Case No. 22-301, and their co-conspirator Cesar Javier Chourio Morante, *see* Criminal Case No. 22-299, with conspiracy to commit wire fraud and money laundering for their involvement in the scheme. All three defendants have been extradited from Panama to Pittsburgh, where their cases remain pending.

In August 2023, Gutierrez elected to plead guilty; at sentencing, his guideline range is 30 to 37 months of imprisonment. Feurtado and Bouanane both proceeded to trial, where they were convicted by the jury. The Probation Office has found that Bouanane's applicable guideline range is 37 to 46 months of imprisonment, and that Feurtado's applicable guideline range is 78 to 97 months of imprisonment.

## ARGUMENT

The Court shall impose a sentence sufficient but not greater than necessary to comply with the purposes set forth by Congress in 18 U.S.C. § 3553(a). First, the Court's sentences must account for the seriousness of, and provide just punishment for, the offense. As the Court has already recognized in sentencing Orozco Perez, this is a very serious offense that involves the exploitation of elderly victims and the love that they feel for their grandchildren. To induce the victims to part with thousands or tens-of-thousands of dollars, members of the conspiracy lied to, frightened, isolated, and pressured them. The conspirators arranged to take the money from the victims in person at their addresses, thereby making them feel unsafe in their homes. And they did all that out of greed—simply to make money for themselves. This is a serious offense that warrants a serious punishment.

Second, the sentences in this case should afford adequate deterrence to criminal conduct. Every "bondsman" and safehouse charged in these related cases has maintained that they did not know the substance of the communications made directly to the elderly victims. Even if that is the case, each defendant knew, or at the very least willfully avoided knowing, that he was engaged in a criminal conspiracy stealing cash from the elderly. The sentences in these cases should be serious enough to deter individuals who calculate that they could make money through elder fraud but escape punishment by claiming ignorance about the nature of their actions. Individuals considering this type of conduct must understand that the legal consequences are not worth the risk.

Third, the Court should remain cognizant of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The United States' investigation and prosecution of this elder fraud has now resulted in the federal indictment of nine individuals. One of those defendants, Adrian Orozco Perez, has been sentenced to 36 months of imprisonment for his participation as a "bondsman." Each additional defendant's culpability should be assessed in relation to that of Orozco Perez.

Finally, the sentences in these cases should provide for restitution. The United States requests that restitution be ordered to the following victims, in the amounts, and from the defendants, identified in the table below:

| Victim | Amount | Defendants |
| --- | --- | --- |
| T.D. | $15,000 | Feurtado, Bouanane |
| J.A. | $9,325 | Feurtado, Gutierrez |
| M.I. | $18,100 | Feurtado, Gutierrez |
| F.M. | $15,000 | Feurtado, Gutierrez |
| J.H. | $12,000 | Feurtado, Gutierrez |

| Victim | Amount | Defendants |
|---|---|---|
| H.R. | $15,100 | Feurtado, Gutierrez |
| W.Q. | $30,000 | Feurtado, Gutierrez |
| C.F. | $18,000 | Feurtado, Gutierrez |
| R.B. | $19,000 | Feurtado, Bouanane |
| M.C. | $26,995 | Feurtado, Bouanane |
| R.H. | $10,000 | Feurtado, Bouanane |
| A.B. | $19,000 | Feurtado, Bouanane |
| F.D. | $17,000 | Feurtado, Bouanane |
| J.G. | $18,000 | Feurtado, Bouanane |
| M. P. | $10,000 | Feurtado, Bouanane |
| R.M. | $5,000 | Feurtado, Bouanane |

In order to provide restitution to those victims, the United States further requests that the approximately $253,916.86 identified in the stipulation filed at Document No. 166 be forfeited as to all three defendants.

The United States submits that the sentencing factors above apply to Feurtado, Bouanane, and Gutierrez as outlined in the following sections.

*Roberto Gutierrez*

Of the three defendants charged in this case, Roberto Gutierrez participated in the conspiracy for the shortest period. During that time, however, Gutierrez collected approximately $117,525 from victims in the Western District of Pennsylvania. As someone who picked up money directly from victims, Gutierrez would certainly have known that the scheme targeted the elderly. And his knowledge of the scheme's fraudulent nature can be inferred from the coded Signal

messages that he sent while participating. When Gutierrez informed Zanetti, Ferrer Avila, and Feurtado that it was "14 minutes for the Hawaiian extra cheese," he was actually telling them that he was fourteen minutes from the home of a victim—from whom he would ultimately steal more than $18,000 in cash.

In the view of the United States, Gutierrez should receive a sentence materially longer than the 36 months of imprisonment received by Adrian Orozco Perez, and the Court should vary upward as necessary to impose one. While it is true that Orozco Perez participated in the conspiracy for longer and in more places, both defendants were "bondsmen" and collected similar amounts of money from victims. Moreover, Orozco Perez's prompt acceptance of responsibility distinguishes his case from that of Gutierrez, who pled guilty only after the government had begun preparing for trial.

*Tarek Bouanane*

Tarek Bouanane should receive a materially longer sentence than Roberto Gutierrez and should likewise receive an upward variance. As an initial matter, Bouanane participated in the conspiracy for longer than Gutierrez did. Before traveling to Pittsburgh, Bouanane served as a "bondsman" in New Hampshire and dropped a portion of the stolen funds in New York City, to be converted to cryptocurrency and sent to Panama. In the process, he negotiated a bonus for himself—extra victim funds to keep him engaged in the conspiracy. Unlike Gutierrez, who ultimately elected to plead guilty, Bouanane has never accepted responsibility for his criminal conduct, which was proved beyond a reasonable doubt at trial. The evidence against Bouanane included recordings in which he explicitly acknowledged dealing with "old people." *See* Exhibit G-49H. During his participation in the conspiracy, Bouanane took tens of thousands of dollars in cash directly from the elderly victims, including one who needed to cover a breathing stoma in

order to speak.  That was what Tarek Bouanane was willing to do to "get ahead."  *See* Exhibit G-47 at 68 (message sent 9/25/2021 at 11:49:56 UTC).  Bouanane's conduct was egregious, and the Court's sentence should recognize that fact.

*Roderick Feurtado*

For Roderick Feurtado, the United States requests a sentence of 97 months of imprisonment, at the top of his applicable guideline range.  That sentence would appropriately reflect that Feurtado was the person with direct connections to Zanetti and Ferrer Avila, that he recruited Bouanane and Gutierrez, that he supervised them during the operation of the conspiracy, that he was responsible for more than $250,000 in losses to elderly victims, and that he tried to hide away the victim funds by changing hotels after Gutierrez's arrest.  Those are the facts, in combination with Feurtado's refusal to accept responsibility, that have produced the applicable guideline range of 78 to 97 months.  Based on that record alone, the Court would be justified in imposing a 97-month sentence to reflect the seriousness of Feurtado's offense and his role in it.

But there is more in the record—namely, the torrent of self-serving, frivolous, and false claims that Feurtado made during his trial testimony.  These included inflated claims about his business background, *see* Sept. 28, 2023 Tr. at 136:15–137:18; that he thought 21-year-olds could be "elderly," *see id.* at 113:10–19; that he had cooperated with the government and had his arm broken in jail as a result, *see id.* at 156:14–157:05; that he switched hotels only to obtain a second bed for his visiting brother, *see id.* at 173:04–174:05; and that, at the time he was arrested, he was planning to go to the police, *see id.* at 178:21–180:19.

At trial Feurtado seemed upset that the government was unwilling to simply accept his self-serving explanations, accusing the case team of "go[ing] by the evidence.  And that's what you've been doing since day one, evidence, evidence." *Id.* at 156:14–15.  Feurtado apparently intended

that as a criticism—because the evidence squarely contradicts his claims. Although from the witness stand he professed to be a successful businessman with a multi-million-dollar income, he was deemed "financially unable to employ [his own] counsel" in this case. *See* (Doc. No. 64). Although he claimed to have cooperated fully, Feurtado refused in conversations with the government to accept responsibility for his own conduct and declined to enter a plea. Although he claimed to have had his arm broken as a result of his so-called cooperation, the government has not located record of such an assault. And although he claimed to have switched hotels only out of concern for his brother's comfort, communications received from Panama after trial conclusively demonstrate otherwise. *See* Exhibit A to Sentencing Memo.

Feurtado has constructed a persona for himself—Mr. Worldwide, the globetrotting cryptocurrency tycoon and multi-million-dollar earner. In reality, he is a fraudster who traveled to Pittsburgh to steal money from the elderly. Even after his testimony and conviction at trial, Feurtado will not drop the act. His presentence report reiterates his claims of business success and lucrative jobs. *See* (Doc. No. 183) at ¶ 51. But "[w]hen asked what he did with the money he made from his high paying jobs, the defendant stated that he gave away money to help people; expenses paid during COVID when he was not working; court costs; and his wife's living expenses." *Id.* ¶ 53. He also shared with the Probation Office his plan to "ask [C]ongress to establish a 'Grandpa Protection Program,' which would be a program/system to help prevent elderly people from being duped by these schemes." *Id.* ¶ 37.

The best way for this Court to help prevent elderly people from being duped would be to impose a significant term of imprisonment on Feurtado. Feurtado's willingness to lie and manipulate, and his unwillingness to accept responsibility for his conduct, raise a concern that he could pose an ongoing danger to the public. They also betray a lack of respect for the law and for

the Court.  In Feurtado's case, a sentence of 97 months of imprisonment is necessary to achieve the purposes set forth in 18 U.S.C. § 3553.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*s/Jeffrey R. Bengel*
JEFFREY R. BENGEL
Assistant U.S. Attorney
Pittsburgh, Pennsylvania 15219
DC ID No. 1018621