**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 21-476 |
| RODERICK FEURTADO, | ) | |
| Defendant. | ) | |

# MEMORANDUM ORDER

Defendant Roderick Feurtado was convicted at trial for his role in a "grandparent scam" operating in the Pittsburgh area. Mr. Feurtado acted as a manager within the conspiracy by recruiting couriers, coordinating pickups, collecting victim funds, and communicating with higher-level organizers.

The Court sentenced him to 120 months' imprisonment, which was an upward variance from the Guidelines range of 78 to 97 months. ECF 212. On direct appeal, the Third Circuit affirmed. *United States v. Bouanane*, No. 24-1133, 2025 WL 1099693 (3d Cir. Apr. 14, 2025).

Mr. Feurtado now moves under 28 U.S.C. § 2255, raising five claims. ECF 270. While these are styled as five claims, they are overlapping and duplicative in many ways.

On careful review of the parties' briefs and the relevant record, the Court denies the motion for the reasons stated in the government's opposition (ECF 276), which are incorporated by reference into this order. In short, as correctly identified by the government, Mr. Feurtado's arguments lack merit or are defaulted, and to the extent that they implicate counsel's performance, they neither establish deficient performance nor prejudice to Mr. Feurtado.

There is, however, one close call. The close call is Mr. Feurtado's IAC claim relating to how the loss amount was calculated under the Guidelines. As to this

argument, the Court finds that the government has the better position, but because this is a debatable issue, the Court will issue a certificate of appealability as to this specific claim.

**STANDARD OF REVIEW**

Most of Mr. Feurtado's claims are governed by the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong, a movant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Under the second prong, the movant must demonstrate prejudice.

To the extent that the motion raises independent due-process or sentencing-error claims, procedural-default principles apply. A movant who failed to raise an issue at trial or on direct appeal generally must either demonstrate both cause and actual prejudice or establish actual innocence. Actual innocence requires factual innocence, not merely the existence of alleged legal errors. Cause ordinarily requires some objective external factor that prevented the claim from being previously raised. *See Bousley v. United States,* 523 U.S. 614, 622–24 (1998).

**DISCUSSION & ANALYSIS**

**I. No evidentiary hearing is warranted.**

At the outset, the Court finds that no evidentiary hearing is needed to resolve the motion. "Where a petition alleges any facts warranting relief under § 2255 that are not clearly resolved by the record, the District Court is obligated to follow the statutory mandate to hold an evidentiary hearing." *See United States v. Bragg*, No. 25-1281, 2026 WL 2322959, at *4 (3d Cir. Aug. 11, 2026) (citation modified).

Every one of Mr. Feurtado's claims, save one, lacks any merit. The one claim that has some merit to it is discussed below. However, the Court finds that no evidentiary hearing is needed for that claim because it involves a pure question of law and so can be "clearly resolved by the record."

## II. The Court rejects Mr. Feurtado's IAC claim relating to the loss amount, but will issue a COA on it.

### A. "Loss" under Guidelines Section 2B1.1 is unambiguous, and even if it were not, Application Note 3(E) is a reasonable interpretation.

The Court rejects Mr. Feurtado's claims on the merits for the reasons stated by the government in its response, so it won't repeat that analysis. But there is one claim that is arguably a closer call, so the Court addresses it in detail as part of this order. This is the claim that relates to how "loss" was calculated under Section 2B1.1 of the Guidelines, and whether counsel was ineffective for failing to raise this argument at sentencing.

At sentencing, the Court used the 2023 Guidelines Manual, which was then in effect. The Court adjusted Mr. Feurtado's offense level, increasing it by 12 levels because, under Guidelines Section 2B1.1, the loss was more than $250,000 but less than $550,000. A material part of that loss amount though was $253,916.86 that law enforcement seized from two bank accounts and from Mr. Feurtado's hotel room after he committed the offense. As part of the judgment, the Court ordered the seized proceeds to be forfeited to the government, so that the money could go back to the victims. *See* ECF 212, at p. 8 (forfeiture provision of judgment).

Mr. Feurtado now argues that because law enforcement seized the $253,916.86, those were not losses to the victims, and so should not have been included in calculating the loss amount under the Guidelines. He relies primarily on the Third Circuit's decisions in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), and *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), in making this argument.

In *Nasir*, the Third Circuit explained how district courts ought to interpret the Guidelines and commentary in light of the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019). The Third Circuit concluded that a district court must look to the text of the Guidelines provision itself and apply the plain meaning if the

provision is unambiguous. Only if the provision is ambiguous would a court then turn to the commentary. Even then, a court cannot blindly defer to the commentary, but must make a "context-dependent" assessment of its reasonableness. *See Nasir*, 17 F.4th at 471.

In *Banks*, the Third Circuit applied these principles to Section 2B1.1 of the Guidelines, which is the loss provision here, and held that "loss" unambiguously means "actual loss." The Court rejected the idea that the Commentary's inclusion of "intended" loss could expand the unambiguous text of the Guidelines. *See Banks*, 55 F.4th at 258 ("Our review of common dictionary definitions of 'loss' point to an ordinary meaning of 'actual loss.' None of these definitions suggest an ordinary understanding that 'loss' means 'intended loss.' . . . Because the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight.").

Mr. Feurtado argues that *Banks* controls. He argues that the victims here did not suffer actual loss because law enforcement was able to later recover about $253,000 from Mr. Feurtado's hotel room and two accounts.

To begin with, this is different than *Banks*. There were *actual* losses to the victims here. Mr. Feurtado and his coconspirators stole over $250,000 from the victims. True, some of the money was *later* seized by law enforcement when Mr. Feurtado was caught. But that doesn't mean that there weren't actual losses incurred by the victims at one point.[1]

The more central question is this: what is the point in time at which the actual loss is to be measured? On one side, the government suggests that it's when the victim is deprived of the money. On the other, Mr. Feurtado suggests that it's at the

---

[1] One might expect that forfeited funds would be returned to the victims. But that can be complicated, and it is technically in the discretion of the Attorney General. 21 U.S.C. § 853(i) (describing the Attorney General's authority and the processes by which victims can obtain forfeited funds).

time of sentencing. There is a Guidelines comment that deals with this timing issue. Application Note 3(E) provides that a defendant obtains a credit against any loss amount under Section 2B1.1 if the money was returned to the victim before the offense was detected. *See* U.S.S.G. §2B1.1 cmt. n.3(E) (2023) ("Loss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered . . . to the victim before the offense was detected."). In other words, applying this credit means that the total actual loss would be essentially measured up to the point of detection.

So, the *Kisor/Nasir/Banks* issue here is whether Guidelines Section 2B1.1 itself is unambiguous on the point at which the loss would be measured, and if not, whether Application Note 3(E) is a reasonable interpretation of this Guidelines provision.

The Court concludes that Section 2B1.1 is unambiguous in defining loss at the moment when the victim was harmed. *Banks* helps here.

In *Banks*, the Third Circuit relied on dictionary definitions of the term "loss," all of which pinpoint loss being the instance of losing, point of deprivation, or moment the harm is incurred. *See Banks*, 55 F.4th at 257–58. As such, it is plain that actual loss is measured at the time the victim is harmed, even if the harm is partially cured down the line.

Put differently, if a victim's watch was stolen but the police locate it and return it two months later, no one would conclude that the watch wasn't lost. It was lost because the victim was deprived of it. That this ended up being only a temporary state due to good police work doesn't change the fact of the loss.

But even if "loss" were to be found ambiguous in this context, Application Note 3(E) is a reasonable interpretation as to the outer point at which to give a defendant a credit or to define loss based on later recovered proceeds. In this regard, the

Seventh Circuit's decision in *United States v. Gulzar*, 92 F.4th 684, 687 (7th Cir. 2024), is instructive.

There, the Seventh Circuit offered several persuasive reasons as to why the point of detection under Application Note 3(E) made sense as to the outer bounds of when loss would be calculated or credits given to a defendant—*e.g.*, (1) payments to victims after a fraudulent scheme may reflect a desire to avoid punishment and not genuine remorse for wrongdoing; (2) payments after the detection of fraud do not change the fact of loss; and (3) measuring actual loss at the time of sentencing would lead to perverse incentives: a defendant could simply repay the victims in full that day to assure himself the lowest of the possible sentencing ranges. *See Gulzar*, 92 F.4th at 687.[2]

These reasons make clear that the commentary is a reasonable construction of Section 2B1.1, which, from its text, is meant to measure the seriousness of the offense conduct in relation to the money that was stolen and the harm inflicted on the victim. It is appropriate to defer to it.[3]

As a result, the Court finds that Mr. Feurtado's counsel's failure to object to the loss amount at sentencing was not deficient, and therefore cannot serve as a basis for an IAC claim.[4]

---

[2] *Gulzar* didn't involve a case of forfeiture. Instead, before the criminal case resolved, the victim sued the defendant, and the defendant during that lawsuit repaid the money he had stolen. *Gulzar*, 92 F.4th at 685. But the thrust of the defendant's argument was the same there as Mr. Feurtado's is here.

[3] Indeed, Application Note 3(E) doesn't expand the definition of "loss" in the way that worried the Third Circuit in *Banks*. It deals with the separate concept of return or recovery after loss, and basically allows a defendant an offset if some of the stolen money is returned before he is caught.

[4] Mr. Feurtado also raises this same loss issue as a standalone argument. But he never raised it on direct appeal, and therefore procedurally defaulted it. There is no cause and prejudice to excuse the default.

**B. The Court will issue a certificate of appealability.**

Even though the Court has rejected all of Mr. Feurtado's claims, the Court will issue a COA as to the IAC claim related to the loss calculation.

To obtain a COA, Mr. Feurtado must show "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court finds that Mr. Feurtado has met this showing, for two reasons.

First, the Court finds it is debatable as to the meaning of the term "loss" and whether Application Note 3(E) is a reasonable construction in defining the outer bounds of loss. The Third Circuit has not addressed this issue. One district judge in this Circuit declined to apply Application Note 3(E), finding it to be inconsistent with *Banks*. *See United States v. Ford*, No. CR 23-130, 2026 WL 35232, at *10 (E.D. Pa. Jan. 6, 2026) (Slomsky, J.).[5] A debate therefore exists.

Second, if Mr. Feurtado is right, then it would have been deficient for his counsel to not have challenged the loss amount at sentencing. It also would have

---

[5] *United States v. Ford*, No. CR 23-130, 2026 WL 35232, at *10 (E.D. Pa. Jan. 6, 2026) (Slomsky, J.) ("Furthermore, it should be noted that the Commentary in Notes (3)(E)(i) and 3(D)(i), when applied, also amends the definition of 'actual loss' by putting a condition or temporal component on it by eliminating from actual loss the money returned 'by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.' U.S.S.G. § 2B1.1, Note (3)(E)(i). However, while this note or regulation has a noble purpose—to encourage fraudsters or thieves to return the proceeds of their fraud or theft at the earliest possible time before being caught, and not to reward them for returning proceeds after the offense was detected—it expands the definition of 'loss.' This condition or temporal component results in the actual loss being increased beyond the actual harm to the victims because, as in this case, the SEC returned a portion of the money fraudulently obtained. Since the text of § 2B1.1 (pre-2024 Guidelines) includes only actual loss, the Commentary cannot transform money that victims did not actually lose into a 'loss' simply because it was retuned by a third-party and not a defendant or his confederates after detection of the offense. Therefore, Notes 3(E)(i) or 3(D)(i) of the Commentary do not apply and cannot be used to foreclose Defendant from receiving a credit for the money returned to the victims by the SEC.").

been prejudicial. The Court upwardly varied in this case well above the Guidelines range, but the Guidelines nonetheless were used as a starting point at sentencing. As such, it is at least reasonably probable that the sentence could have ended up being less had the initial Guidelines range been lower. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016).

The Court therefore concludes that Mr. Feurtado has made a substantial showing of the denial of a constitutional right to effective assistance of counsel.

****

AND NOW, this 16th day of November, 2026, for the above reasons, the Court **DENIES** Mr. Feurtado's Section 2255 Motion (ECF 270).

Pursuant to 28 U.S.C. § 2253(c) and Fed R. App. P. 22, the Court issues a certificate of appealability to Mr. Feurtado as to one aspect of one claim in his motion: whether counsel was constitutionally ineffective for failing to challenge the loss calculation under Guidelines Section 2B1.1 in light of *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022).

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

cc:
Roderick Feurtado
USMS 75578-509
FCI Allenwood Low
P.O. Box 1000
White Deer, PA 17887